May it please the Court, Charles Sevilla for Appellant Awad. I'd like to start with a discussion on the charging statute, which is 18 U.S.C. 1347, because we have a dispute here as to what the elements are, specifically the mental state element, and that issue transcends arguments, one, concerning the indictment, concerning the instructions to the petty jury, and also would be relevant to the issue on the Court's instructions on supervision levels. 1347 was passed in the mid-'80s. It has not been used with great frequency. And we have a question as to what the terms knowing and willfully mean. And both sides have cited a Supreme Court case, Bryan v. United States, which discusses the various meanings of knowing and willfully. Don't you think that the indictment put the defendant on notice of that his conduct was willful? Well, it put him on notice that the government was charging him with attempting to defraud. Even though it didn't use the word willful, that he was well on notice that that was a charge against him, that his conduct was willful? That's one notice, yes. That's an element of the requirement of including all of the essential elements in an indictment. The other part of the charging duty of the prosecution in charging all the essential elements is to charge a crime. So notice is one thing, but they have to charge the elements of the offense in order to have charged a crime. Did the indictment contain enough in there so that there was a charge of an offense which was willfully committed? I argue no for this reason. During the discussion mid-trial on the issue of willfully, the prosecution stated to the court that willfully means that you have to know that what you're doing is against the law. And they said that's not included in 1347. And that's our dispute with the government's position, because willfully would mean in a case where we're talking about complicated Medicare laws and interpretive rulings that the person who's going to be charged with a crime for violating those rules should be, the government should be required to prove that they knew they were violating the law. We would also argue that willfully means in this context arguing that it's, the element includes violating that law as this Court has held in the kickback laws, that the willful intent there is the intent to violate the kickback law. Backing off from that, that's akin to what the Supreme Court held in the Cheek case, where they said that the defendant in tax cases has to know they're violating a known legal duty, a tax law. Let me ask you this. Because you did not challenge the indictment pretrial, doesn't that change our standard of review to some extent? The Court dealt with this and cited the Pupo case out of the Fourth Circuit. I'm asking, that's a yes or no question. Do we have a different standard of review? No. No. Under Pupo, which the court, the district court cited, well, let me put it this way. There are post-challenge conviction, post-trial challenges to an indictment. That's clearly a different standard of review. It's a more forgiving one for the government. Pretrial, it's less forgiving. In this case, it was mid-trial. And Pupo case, which … That's not a Ninth Circuit case. No. It's a Fourth Circuit case. But Jeopardy had already attached. Jeopardy had attached. And so it was too late for the government to fix it. So why wouldn't that kick in the more, as you put it, more forgiving standard? Well, I would argue that citing the case that the court, district court cited, Pupo said it isn't a more forgiving standard because the law is that the government must charge the essential elements of the offense. If they don't do it and it's brought to the attention mid-trial or pre-trial, then there must be a sanction. But let me move on to a more glaring error on this issue of willfulness. It's the instructions. That's the instructions. Okay. I have a question about that. You know, speaking only for myself, I find your argument very persuasive that there was error in the instructions given Brian and Henderson and some of the other cases. But that doesn't get you all the way home. There's a question that has been asked in our other cases, which is whether that error is harmless beyond a reasonable doubt. And I have some difficulty seeing how there could be any possible prejudice here because of the nature of the acts themselves, how anyone could possibly find rationally any juror that he did not commit these acts, even if the proper definition of willfully had been given. And assuming that proper definition was violated. He had to know that his activities were unlawful. Correct. And specifically I'm thinking of the fact that this scheme to defraud was so basic. I mean, he was billing for things that never happened, for example. I mean, I don't see how a juror could ever find that that wasn't, that somebody didn't know that was unlawful. Let me add one fact to that. Same scenario because it gets to the same point. With regard to money laundering, the instructions told the jury the government must prove the defendant knew that the funds transferred represented the proceeds of unlawful conduct, violation of the health care fraud statute. So it seems to me the jury is faced with exactly the question you're saying they should have been faced with in the first set of counts. They answered him yes on the second set of counts. Absolutely not. It's a two-step. It was a two-step instruction. So the first thing they had to do was find the 1347 violations in 24 counts based on faulty instructions. So they found that. So they found it, and then they would have said, okay, we found under these faulty instructions the 1347 violations. Now the instruction says if we found that, then we go into money laundering without the requirement of a willfulness to I don't think that that money laundering instruction makes up for the deficit in the 24. It doesn't make up for it, but we always presume that the jurors actually follow the instructions that they're given in this case. That's why we have to go, in my personal view, to the second step on harmlessness on the ones. But the instruction that Judge Clifton just read to you required knowledge of unlawfulness. So I guess the question is, if they found knowledge of unlawfulness as to some counts, how can we possibly find that there was prejudicial error by failing to require that finding? That instruction reads at ER 99, the government must prove the defendant knew the funds transferred represented the proceeds of unlawful conduct. Now, once they have determined that the 1347 offenses took place, they have already found unlawfulness, albeit without the essential mens rea. So they would not go revisit the mental state for that. They would just say, well, we found the 1347 offenses, so therefore there was a violation of 1347, and these were the proceeds. It did not require them to go into a mens rea to figure out that what he did was against the law in the 1347. I understand your argument about the order of things, but let me go back to my original question, and that is how could any jury faced with this particular scheme to defraud have possibly found it not to be knowing? I mean, certainly there can be some things about Medicare that are complicated and all that, but billing people for things that you don't do is common theft. How could anybody find he didn't know that was unlawful? Well, that was the government's version of the events. Yes, and because of the conviction, we have to take the facts most favorably to the government. Right, and I'm not arguing sufficiency of the evidence. I'm arguing that there is a reasonable doubt as to whether a jury which was told, you must find that he was violating a known legal duty, that what he was doing was against the law. And so let me address the two things. So would anybody know that stealing is against the law? Let me address the two bases that are in the indictment were that he billed when he was on vacation, and he said that, yes, I billed. First of all, my requirement, as I understood it, was not direct supervision, but I could be on call, so I didn't have to be every single place. He was at a number of the board and cares, but he wasn't at all of them all of the time. So his assumption, and by the way, there was no regulation in place saying that he had to be there giving direct supervision until January 1, 2002. And that covers all but four counts. That's counts one through 20, which were in the era of no regulation. And wouldn't you say, I don't want to get you off the track here, that generally the general regulations probably indicated to him that that was he couldn't do that, even though there was nothing specific about these board and care facilities. General regulations sort of tell him you can't do it that way. No. And I'll state why. I don't want to miss Judge Graber's point, though. Let me get to that, and then I'll address your point. He testified that there was no requirement, and there wasn't a regulatory requirement that he be directly supervising. There is material in the record, which I'm going to address in a moment, which justified that belief. Now, the two classes of counts were the ones where he was on vacation, and he said, I had three doctors who backed me up to do what I was doing. That's at pages 175 and 176 of his testimony. There was no refutation of that. Commonly, doctors go on vacation, and people take their place to do what they're doing. So that's not billing for when he's not there. He has somebody doing what he thought was appropriate. And that was, as I say, December 16th, pages 175, 176, where he said, I had people taking my place. I think I've got you off the track. Get back onto the other. The other class of counts, which would have been one through 16, were for when the therapist, on-site therapist, billed for 16 matters that are charging counts one through 16, when the patient was either leaving that day for a hospital or was in the hospital. Since he was on call, he said, number one, I had no idea they were doing this, and this happened in the thousands of therapies that were done. This happened, I think the count was 122 times, where some therapists billed for what appears to be a time when the patient wasn't even at the board and care. So his defense to that in getting to this prejudice issue is, number one, I didn't have to be there. I was on call, and I was going to all these board and cares, so I was on call. I didn't know that 122 times out of the thousands of billings that the patient was someplace else and that a therapist on-site forged a document. I wasn't, number one, I, Dr. Awad, was not doing the billing. That was Mr. Herman Thomas's responsibility. So, again, that does not show that he did something in knowing violation of the law when on all of the charge counts there were these two classes, one involved the therapist putting in a bill when the patient wasn't there and the other one when he had backup when he was on vacation. So it's not that he billed knowingly for something that wasn't done. He testified, I never did that. I always thought I was billing appropriately, he said. Now let me respond to Judge Reed's question about what is in the record which would have given him any kind of a reasonable basis to think that he could bill under general supervision. And I'll just recite ER sites and what they are. They're all in volume two of the ERs. The first one is that the Federal Register in 1997 labeled the two CPT codes which were for aerosol inhalations and chest rubbing, massaging, as diagnostic. And the reason that those are diagnostic is that the CPT code cited at 367 of the ERs, when you look at the two code sections, one of them explicitly says diagnostic and the other one says this manipulation of the chest wall can be for a demonstration or evaluation purposes. And also, as I said, the Federal Register put these as diagnostic and at that time diagnostic procedures arguably did not have to be under a direct supervision. In fact, we cited a 1998 newsletter that cited at 325 of the ERs, a Medicare newsletter, and again, that's all that was controlling at this period. That's all that was out there, whether it wasn't an official regulation. That newsletter at 325 said diagnostic tests must be done at least under a general supervision, thus giving the doctor notice that general supervision was a possible proper level and you didn't have to be there, you could be on call. The Medicare manual itself cited at 362 of the ERs said, be careful to builders, diagnostic tests should not be placed under the incident to rule of services. That is, if a doctor performed a, if a doctor billed for an incident to service that was conducted by ancillary help, if it's incident to, it had to be direct supervision, but they said diagnostic tests are not billed under that, and that's at ER 362. And finally, I'd like to call the attention of the Court to the Medicare, excuse me, Medi-Cal audit letter, and this is highly instructive on what would have been going on in Dr. Ewad's mind. He got a letter for documentary deficiencies. The entire letter is located at ER 341, and it goes on for about eight pages. Now, what's interesting about this letter is anybody who reads this letter would think it is okay to do what he's doing. That is, it is okay to bill under general supervision for inhalation therapies. Now, why do I say that? Because several times in this letter, the Medicare, the Medi-Cal people say as much. For example, they say with prior authorization, if, this is on 345, and we're talking about inhalation treatments on ER 345, it's the middle paragraph, and the final sentence says prior authorization is required if inhalation therapy is the only service comma, the physician is not in the office while the service is performed, or if the service is performed in an outpatient facility by someone other than the physician as part of a prescribed treatment plan. That is saying that the doctor doesn't need to be present, and it's performed out of the office by someone other than a physician as part of a prescribed treatment plan. Now, remember, Dr. Awad was present at all the initial treatments and prescribed a treatment plan for these folks to get when the therapist came in to give them the inhalation or the chest rubs under the two CPT codes. This provision ‑‑ I think I'll reserve, but I would say all of these data would indicate prior to 19, excuse me, 2002, that it was not a slam dunk at all that direct supervision was required. And thus getting to the willfulness component, there was prejudice in failing to properly instruct on this element. Thank you. I'd like to start with Judge Graber's question to counsel about whether a different standard of review applied, because this challenge to the indictment was not made pretrial. And the answer counsel gave was no, and I believe that's incorrect. I believe the answer is yes. The answer is absolutely a different standard applied. The court recognized as such in Dubot, and, Your Honor, Judge Graber, you recognized as such in your dissent from the decision not to rehear the O'Meara case in Bank, you said our established rule for challenges that come at later stages of the district court proceeding is to liberally construe the indictment in favor of validity. So I wanted to make that point about the indictment challenge. I'm going to persuade the court, and Judge Graber, you've already indicated that perhaps you're not going to be persuaded, but I'm going to try anyway, with respect to the willfulness instruction. And I want to start with the court's opinion in Henderson, and I feel a little bit fortunate that, Judge Graber, you wrote that, because in Henderson, as I understand it, the court interpreted the Bryan-Ratzlaff line of cases as meaning that willfulness requires knowledge that the conduct was unlawful rather than merely wrongful in two different kinds of circumstances. One, where the conduct is criminalized in some kind of regulation rather than a statute, or, two, where the conduct itself is not obviously unlawful. And neither is the case here. In the first instance, the defendant is not charged with violating some sort of Medicare rule or regulation. He's charged with health care fraud. He's charged with lying to Medicare. And I think Judge Graber used a word that is very appropriate. He's charged with stealing. He's charged with making false claims to Medicare. Well, that's what the proof showed. It's a little bit more subtle than that as to what he's actually charged with, it seemed to me. And Henderson does say that the person has to know that the conduct is unlawful. And here, the trial judge wasn't even silent about it. He said just the opposite. He said he doesn't have to know that it's unlawful, even though it's a not a malum in se, a crime, what we used to refer to as something anybody would know was unlawful. Well, Your Honor, I would submit, first of all, that lying to Medicare, submitting false statements to Medicare is a malum in se crime. Everyone would know that you can't submit a claim to Medicare that bills for treatments that didn't happen or bills for treatments that weren't performed. Is there evidence that he knew that he billed for treatments that didn't happen? We know that he billed for treatments that didn't happen, and we know, we can presume he knew that would be wrong. But is there proof that he knew that's what was going on? Well, Your Honor, the evidence was that the defendant was not present 99 percent of the time when the treatments were rendered. The evidence also shows the defendant received the Medicare EOBs or explanation of benefits for the treatments that were rendered. I don't think the proof at trial could show that on a daily basis he was aware of who was treated at the various facilities and who wasn't, for the simple reason that there were treatments being given at numerous board and care facilities at the same time. Well, he plainly had no direct knowledge of what was going on. He doesn't dispute the fact that he wasn't there. He makes the argument that under the regulations and the billing standards and so forth, he wasn't required to be there. Now, you can believe that or not, but unless there's affirmative proof that he knew he was doing something wrong in that department, we still don't have that last connection that he knew what he was doing constituted lying to Medicare and taking money under false pretenses. In some place, either on the legal side or on the factual side, his knowledge becomes important. And it's fair to say that everybody knows stealing is wrong. But we've also all filled out forms and sometimes checked boxes that didn't seem right, but we were told that's what to do. I was with my son a few months ago, starting at college, filling out a credit card application. And the woman at the bank is telling him what to fill in. I'm kind of furrowing my brow, because that doesn't make a whole lot of sense, but that's what she's telling him to do. That's his defense. Now, it may not be a very persuasive defense, but that's the defense. And if we conclude the law does require willfulness, we're going to have to make that connection someplace. Where do we make it? Well, let me turn to the harmlessness argument in a moment, because I understand that if the court concludes that the willfulness instruction that was given was not legally adequate, we have to get to the harmlessness issue. I do understand the court's point that factually there is an absence of proof, because the defendant simply wasn't there on a daily basis, of who the respiratory therapists were seeing on a daily basis at these various board and care facilities. I would argue that the jury could infer, and this was a co-schemer case, they could infer co-schemer liability from the fact that basically his co-schemer, Herman Thomas, the biller, there was evidence that he was instructing the respiratory therapist, bill for everyone on the list, bill for everyone on the list, regardless of whether those patients were seen or not. So he is to some extent accountable for the actions of his co-schemer. Nevertheless... ...the information being provided was truthful and that he understood that if it wasn't, he could be subject to criminal penalties, I'm paraphrasing. But does that make a difference to our analysis, the certifications for reimbursement? Well, to which part of the analysis, I guess, would be my question. Well, to the harmlessness, whether it's harmless error, whether there's a... The missing link. Well, with respect to harmlessness, I think we need to look at what the district court did instruct. And the district court did instruct that a person acts willfully when they act deliberately, voluntarily and intentionally. And the district court did instruct that a person acts knowingly when they're aware of the act and there's no ignorance, mistake or accident. And also something that's important to note here, there was a very extensive good faith instruction given in this case. And the jury was instructed that the good faith of the defendant was a complete defense and that an honest mistake in judgment or an error in management would not rise to the level of knowledge or willfulness as required by the statute. And that basically it was not the defendant's burden to show that, but it was the government's burden to prove that the defendant acted with the intent to defraud. I'm summarizing and paraphrasing a bit there, but that was the good faith instruction that was given. In other words, the jury had to find that the defendant acted with a bad purpose. They had to find that he deliberately, voluntarily and intentionally participated in a scheme to defraud Medicare. And that was the bad purpose, the intent to defraud. Now, that gets us to the actual issue of harmlessness. And, Your Honor, Your Honor, the jury necessarily found here that the defendant acted with that intent. It's kind of hard to find harmless error when you have the instruction which is the exact opposite of the law. In essence, was the jury told that whether or not he thought he was acting unlawfully or was really irrelevant, they didn't have to consider that and therefore would not have considered that? Well, the jury was told that the defendant had an honest belief about what he was doing or he made a mistake about what he was doing. That was a defense. That's the good faith instruction. Focus on the instruction that appears to me to be wrong, the exact opposite of the law, please. That's the instruction that was given, Your Honor. And the question, I guess, then is, is that instruction harmless? And I would submit that because the jury found that the defendant intended to deceive Medicare, there was no likelihood that the jury would have acquitted the defendant if they had to find that he had to have intent, knowledge that that intent to defraud wasn't lawful. Once the jury found the intent to defraud, that the defendant made false statements, that it was not a mistake or accident, and that he acted with the intent to defraud, which they were instructed means the intent to deceive or cheat. And they rejected any claim of good faith. It's simply not possible to say the jury would have acquitted. Well, they were told that whether he thought his actions were unlawful or not was really irrelevant. Isn't that true? Isn't that what the exact instruction was? That is exactly what the instructions were, Your Honor. In that, would the jury then reasonably consider that that was out of the realm of the things they were to decide and, therefore, would not have decided it that way? I understand the Court's point, but the jury did have to decide whether the defendant acted in good faith, and it did have to decide whether the defendant acted with intent to defraud. And I submit that there's no way they could have resolved both of those cases, both of those questions, in the government's favor without also finding that the defendant had knowledge that his conduct was unlawful. It could not have happened. I would like to take, because I did not finish earlier, I would like to take another moment to go back to the issue of the willfulness instruction, because I wanted to get to the Court's opinion in Torello, which was a securities fraud case in which the Court interpreted the willfully language of the securities fraud statute. And in that case, another case that was authored by, Your Honor, Judge Graber, the Court said that there was, that use of willfully in that statute does not require that the actors specifically know that the conduct was unlawful. And the Court in Torello really just applied the analysis that the Court had set forth in Henderson. And there, I think the key is that the securities fraud statute, like the health care fraud statute here, had an intent to defraud aspect, had an intent to defraud element. We have a statute that is malum in se. This is not a statute. Health care fraud, like securities fraud, is not a trap for the innocent unwary. And I think that's a key vital distinction that this Court has recognized in its jurisprudence over and over and over again. I've cited several of those cases in the government's brief. Torello, English, Baker, repeatedly recognizing that where a statute criminalizes conduct that is malum in se, and I think the example on the other side of the ledger of conduct that is not malum in se, I think was in the Henderson case. Digging for buried treasure, not malum in se. Lying to Medicare, malum in se. That's what we have here, and that knowledge of unlawfulness was not required by the willfully statute. How do you compare this to Ratzlaff? Do you think Mr. Ratzlaff was aware his conduct was criminally unlawful? Well, Ratzlaff, as I recall, Your Honor, involved a violation of the structuring statute, and the conduct involved there was not malum in se, and what the Supreme Court basically said is Mr. Ratzlaff didn't know that he was acting contrary to the I think he knew that he was acting contrary to some sort of provision that required him to bundle up these cashier's checks or checks in less than amounts of $10,000. He knew there was a reporting requirement because people told him there was a reporting requirement if he moved money in sums larger than $10,000. So to avoid that reporting requirement, he bundled up his deposits or movements of amounts less than $10,000. So he was aware of the reporting requirement. There was no evidence in that case that he was aware that violating that reporting requirement thusly was, or structuring the transactions thusly was criminal. How do you relate that then to the facts of this case? Don't you think that the defendant here was aware? I think the defendant was aware. The defendant's own statement to the FBI when he was interviewed was that he was aware. If we're getting to the actual supervision requirements, defendant's statement to the Ratzlaff was aware. That's correct. Before you run out of time, I want to ask you a question about the sentencing portion of the case. And I had some question about the two-level enhancement for risk of injury. And the reason I did is that it seemed to me to be somewhat mixing apples and oranges because the crime charged here is a financial fraud crime. It's getting money when you aren't supposed to get money. And the enhancement is for risk of bodily injury. Now, in the class of cases or the class of situations where he was billing for things that never happened, there's no possible risk of physical injury there because nothing ever happened except getting money. So how do those two things square? Well, I'm going to go back to the fraud scheme as a whole, Your Honor, which is and I think this is one of the things that perhaps is lost a bit in responding to some of the technical arguments here is you lose a bit of the forest for the trees. This was a fraud scheme that targeted mentally ill residents who were mentally ill patients who were residents at long-term board and care facilities. It provided those residents with respiratory treatments that the evidence showed in many cases was unnecessary and not warranted by their medical conditions. It provided those treatments without the level of supervision that Medicare required. And there was testimony at trial that the reason that Medicare required direct supervision of these kinds of respiratory treatments is because they involve vital bodily functions, breathing, and that to have those treatments being given by respiratory therapists without a doctor present was dangerous. And that's why the direct supervision requirement was adopted by Medicare for this kind of incident to service. There was also testimony at trial that some of these treatments were administered by unlicensed respiratory therapists, which would also create a risk to the patients, these long-term residents of these mentally ill board and care facilities who were getting these treatments. So I think when you consider the fraud scheme as a whole and the evidence as a whole that Judge Selma heard, there was adequate evidence in the record to show that this was the scheme, the broader scheme, entailed a risk to those residents of these board and care facilities, and that the scheme itself was a bit more broader in scope than simply lying on a form to get treatment. So that's the reason I think that the court imposed the two-level enhancement, and I think that's the reason it was warranted. I mean, you could have a scheme that dispensed sugar pills or placebos. The whole point of placebo is that they don't do anything. Do we know that the respiratory therapy here did do anything? We have no reports of actual harm. Is there any medical evidence to suggest there was an enhanced risk? There is no evidence of any sort of injury or illness that was created by the respiratory treatments. Is there any medical evidence of the risk part of it? I understand it might not have happened. That doesn't mean there wasn't increased risk, but it seems to me the argument for increased risk is being inferred from the fact that, well, you shouldn't have done it this way, but that's really not much medical evidence. There is no medical evidence. There really isn't any medical evidence. With one caveat, there really isn't any medical evidence in the record at trial at all. The only medical evidence at trial were the hospital records of the six patients who were hospitalized during the pendency of the fraud scheme. Those were introduced at trial, and they were reviewed. And, in fact, what they showed is that five of those six residents, while they were hospitalized, their hospital records show no evidence of any respiratory ailment or lung ailment or breathing ailment whatsoever. Did one of the respiratory therapists testify? Several of the respiratory therapists testified.  No, they said simply that as respiratory therapists, as licensed respiratory therapists, they believe that in many circumstances the respiratory therapies were unnecessary for many of the patients. If there are no further questions from the panel, I see my time is almost up, and I will submit. I believe we're out of questions. And you have some rebuttal time remaining, sir. Thank you, Your Honor. With respect to Torello, which, Your Honor, Graver wrote for the court, it's a different case. First of all, it came with a precedent which this court relied upon. There were a couple of cases cited that established what the mens rea was for the offense. It did not have a knowing and willfully component. It had half of that. It had the willfully component under that statute. And finally, most importantly, the final paragraph of the statute, it was 15 U.S.C. 78FF, said that if the person proves that he did not knowingly violate a rule or regulation, he cannot be sentenced to prison. And so this court said, well, it would be superfluous to find in willfulness a requirement that the person knows he's violating the law because of the failsafe mechanism in the final paragraph, which prohibited imprisonment. So Torello is a unique case, and I don't think it's of any assistance to the court in resolving this matter. I want to say something about the malum and say alleged nature of this offense. What happened in this case is electronically a billing provider number, a CPT code, a place of service card, and money was sent for each of the thousands of treatments that occurred in this case. Dr. Awad said, I thought that was being done appropriately by Mr. Thomas, who was the biller in the case. Now, prior to 2002, there was no regulation. And I cited to the court another statute, 42 U.S.C. 1395HH, which says if it's not a regulation, it's not a binding rule that can be used. And that's cited in the material, and it hasn't been discussed by the government, but that makes sense. If you're going to be charging people with offenses, it's got to be a law. It's either got to be a statute, or it's got to be a regulation where it's gone out for notice. That did not happen prior to January 1, 2002, with respect to the procedures here, where they, in January 1, 2002, they passed a regulation, 42 CFR 410.26, which says if it's not a regulation, it's not a binding rule that can be used. And that's cited in the materials, which said diagnostic services had to be under direct supervision. Prior to that, as I've given the court in a number of examples on my opening argument, there was data out there put out by Medicare and Medi-Cal indicating that nondirect supervision, general supervision, was appropriate. So sending a bill in like that, at least prior to 2002, was hardly a malum and say if it was arguable that you could do that. And all that was being done was the billing that went out in that form. And with respect to the last point, the last point I'll make, I can't tell if I'm over. You're over time, but go ahead and wrap up as you wish. The last point on the sentencing issue, the number zero speaks loudly as to whether Dr. Awad had a conscious or reckless consideration of the risk element of injury to a patient. Well, does the sentencing guideline require that he be conscious of it, or simply that there be a risk? I think it's a conscious disregard, and I cited in my reply brief a case out of this court which I think says as much. So there's certainly no evidence of that. And what was happening on the two procedures? One was a chest massage. There's hardly any danger at all in that procedure. And the other one was an aerosol, basically an albuterol treatment. I had my albuterol treatment this morning on the way to court because I have asthma. I think many people do, and it's seldom a risk situation when you self-therapize, give yourself the therapy. In this case, the vast majority of these treatments were given by physical therapists trained to give the treatment. So how Dr. Awad was supposed to have a conscious disregard for the patient's health is when he was given the treatment. And the fact that he was on call for all these treatments is not supported by the record. And with that, I'll submit. Thank you very much. Thank you, counsel. The case just argued is submitted. We very much appreciate the helpful arguments from both of you. And for this session, we stand adjourned.
judges: Graber, Clifton, Reed